IRVING, P.J.,
for the Court:
¶ 1. Christopher Lee Baxter was convicted of capital murder for the death of George County Sherriff Gary Welford. Baxter appeals his conviction and sentence, arguing: (1) law enforcement pursued the vehicle in which he was a passenger without probable cause or reasonable suspicion; (2) he did not knowingly and voluntarily waive his Miranda[1] rights; (3) his indictment was based on perjured testi *430 mony; (4) the jury was biased; (5) Debbie Welford was allowed to give an irrelevant and prejudicial victim-impact statement during the guilt/innocence phase of trial; (6) evidence of prior convictions was erroneously admitted into evidence; (7) the prosecutor made inappropriate statements regarding “appellate review”; (8) the trial court erred in denying his motion to strike the testimony of one of the State’s witnesses or, alternatively, erred in denying a cautionary jury instruction to disregard her testimony; (9) the trial court erred in giving jury instructions S-5 and S-7; (10) the evidence was insufficient to support the verdict; (11) the jury’s verdict was against the overwhelming weight of the evidence; and (12) the trial court failed to consider the sentencing option of life with parole under Mississippi Code Annotated section 97 — 3—21(3)(c) (Supp.2013). We find no reversible error and affirm.
FACTS
¶ 2. When Baxter failed to appear at a sentencing hearing on July 19, 2010, a bench warrant was issued for his arrest. On July 21, 2010, Sheriff Welford told Deputy Bobby Daffin about the bench warrant and instructed him to be on the lookout for Baxter. Deputy Daffin knew Baxter and his girlfriend, Brandy Williams, from their prior encounters with law enforcement. Later that same day, Deputy Daffin saw Williams driving her father’s maroon Chevrolet Z71 pickup truck in Lucedale, Mississippi. Deputy Daffin had seen both Williamses driving the truck before, and he knew that Baxter was usually in the truck with her. Deputy Daffin could see the arm of a passenger, who appeared to. be leaning back in the seat in order to hide. He could not see the passenger’s face, but based on his suspicion that the passenger was Baxter, he made a u-turn on Old Highway 63 and drove toward the truck to further investigate.
¶ 3. As Deputy Daffin neared the truck, while it was stopped at a stop sign, the driver fled at a high rate of speed. After witnessing the truck pass several cars in a no-passing zone and force other vehicles off the road, Deputy Daffin initiated his blue lights to perform a traffic stop. The driver refused to stop, leading law enforcement on a seventeen-mile chase, with speeds reaching over 100 miles per hour. Based on information received from Deputy Daffin regarding the truck’s location, Sheriff Welford and Deputies John Keel, Duane Bowlin, and Justin Bowlin positioned themselves at the intersection of Bexley and Howard Roads to intercept the truck. The sheriff and deputies were wearing uniforms; and although their vehicles were unmarked, the vehicles’ blue lights were activated. Approximately two minutes after arriving at the intersection, the deputies heard a vehicle approaching. The vehicle, which was revealed to be Williams’s truck, came speeding toward them. According to one of the deputies at the scene, it seemed that the truck never attempted to slow down, but rather continued to accelerate through the intersection. The deputies attempted to get out of the truck’s way. The truck swerved around the unmarked cars, striking Sheriff Wel-ford in the process. Sheriff Welford was thrown to the side of the road, and the driver continued to flee. Paramedics were called, and Sheriff Welford was taken by helicopter from the scene to a hospital in Mobile, Alabama, where he died. None of the officers could positively identify the driver at the time Sheriff Welford was struck. None of the deputies saw the driver’s face.
¶ 4. Williams’s truck was found wrecked in a creek. The center of the truck’s hood was noticeably dented. Bax *431 ter and Williams were found the morning after the incident, hiding in a trailer in the woods. Baxter was in a closet. He refused to surrender his hands for the officers to handcuff him, so he was tased. He then complied and was arrested.
¶ 5. Once in custody, Baxter waived his Miranda rights and admitted to his participation in the high-speed chase. He confessed that he was the driver for the entire pursuit. However, after he was informed that the driver could be determined from security-camera footage, he admitted that Williams was initially driving, but explained that they switched seats before the sheriff was hit. He was adamant that Williams played no part in the crime, only acting at his direction. He stated that they fled because a deputy had “got behind us” and that he then “took [the deputy] for a ride ... down a bunch of roads.” He saw patrol vehicles as he rounded the curve at the intersection of Bexley and Howard Roads, and also saw deputies standing in the road. He admitted that he “might of nudged one of them or something” with the truck’s bumper. Although his memory was unclear, Baxter believed that immediately after this happened, he looked at Williams and said, “I may have f* * *ed up.” He then went around a curve, lost control of the truck, and the truck slid off the road into a ditch. He and Williams fled on foot through the woods and sought refuge in an abandoned trailer. Baxter’s confession was admitted into evidence.
¶ 6. All but one of the witnesses testified that a female was driving during the chase. The witness who saw Williams’s vehicle near the intersection where the sheriff was struck testified that she saw a male driver. Deputy Bowlin, who saw the vehicle at the moment of impact, testified that the passenger may have had the same hairstyle as Baxter, but he did not get a clear look. None of the deputies could describe the driver. Robin Howell, Baxter’s aunt, testified that she spoke with Williams during the chase, and Williams said, “They’re everywhere. They’re everywhere. They’re all over me. I’ve got to change roads.” Howell then heard Baxter in the background say, “Just go then. Just go.”
¶ 7. Both Baxter and Williams were indicted for the capital murder of Sheriff Welford. Baxter’s trial was held May 7-11, 2012. Williams was tried in September 2012. At both trials, it was disputed whether Baxter or Williams was the driver of the truck.[2] Despite Baxter’s confession that he was the driver, his defense at trial was that he was merely a passenger in the truck driven by Williams, and that he did not aid or abet Williams in the crime. Both Baxter and Williams were found guilty of capital murder and sentenced to life in the custody of the Mississippi Department of Corrections without eligibility for parole. Baxter now appeals.[3]
¶ 8. Additional facts, as necessary, will be related in the analysis and discussion of the issues.
ANALYSIS AND DISCUSSION OF THE ISSUES

I. Reasonable Suspicion/Probable Cause

¶ 9. Baxter argues Deputy Daffin lacked both probable cause and reasonable suspicion to initiate a traffic stop; thus, all resulting evidence of the high-speed chase, *432 Sheriff Welford’s death, and Baxter’s arrest should have been suppressed as the fruit of the poisonous tree.
¶ 10. “Whether probable cause or reasonable suspicion exists is subject to a de novo review.” Eaddy v. State, 63 So.3d 1209, 1212 (¶ 11) (Miss.2011). However, this de novo review is limited to the trial court’s decision based on “historical facts reviewed under the substantial evidence and clearly erroneous standards.” Id. (quoting Dies v. State, 926 So.2d 910, 917 (¶ 20) (Miss.2006)).
¶ 11. A suppression hearing was held, at which Deputy Daffin was thoroughly questioned on his reasons for initiating the traffic stop. Deputy Daffin stated that he was informed that morning of Baxter’s bench warrant. He knew Baxter and Williams from past traffic stops, and he knew Williams because she was usually with Baxter, as the two were dating. At approximately 2:39 p.m., Deputy Daffin was leaving the Singing River Federal Credit Union in Lucedale. He saw Williams driving a maroon pickup truck on Highway 63. He recognized the truck as belonging to Williams’s father. He testified that he had seen Williams driving the truck in the past, and he had seen both Williams and Baxter driving the truck in the past, and they were typically in the truck together. Deputy Daffin stated that he did not see Baxter in the truck that day, but he saw “what appeared to be an arm[,] and the seat was laid back....” He “attempted to get closer to the vehicle to make a traffic stop on Scott Road.” As he approached the vehicle while it was stopped at the stop sign at the intersection of Highway 26 and Scott Road, “the vehicle turned left on Highway 26[,] heading west at a high rate of speed and in a reckless manner.” At this point, Deputy Daffin activated his lights and siren.
¶ 12. To make a lawful investigatory stop, a law-enforcement officer “must have ‘reasonable suspicion, grounded in specific and articulable facts[,]’ that allows the officer to conclude the suspect is wanted in connection with criminal behavior.” Harrell v. State, 109 So.3d 604, 606-07 (¶ 8) (Miss.Ct.App.2013) (quoting Eaddy, 63 So.3d at 1213 (¶ 14)). Reasonable suspicion may be obtained from an officer’s personal observation, and “personal observation includes information from other law-enforcement personnel.” Eaddy, 63 So.3d at 1213 (¶ 15). On the other hand, to make an arrest, probable cause is needed. Singletary v. State, 318 So.2d 873, 876 (Miss.1975). “[A]n arrest begins when the pursuit for the purpose of making an arrest begins.” Id.
¶ 13. Baxter argues that Deputy Daffin had neither probable cause nor reasonable suspicion when he began to follow Williams’s truck. Baxter argues that probable cause was needed because Deputy Daffin intended to arrest Baxter from the time he made the u-turn. In the alternative, Baxter argues that Deputy Daffin failed to show reasonable suspicion for an investigatory stop, as he did not see Williams engaged in criminal activity; and he had no proof that Baxter was in the vehicle.
¶ 14. Baxter’s argument that Deputy Daffin initiated the traffic stop for the purpose of making an arrest is contrary to the testimony. At the suppression hearing, Deputy Daffin testified as follows on cross-examination:
Q. So at that moment, when you pulled out and made your U-turn on Scott Road over by Old 63, you began to accelerate' to initiate a traffic stop; isn’t that true?
A. I accelerated to catch up with the vehicle in an attempt to make a traffic stop, yes.
*433 [[Image here]]
Q. You accelerated to make a traffic stop. You were pursuing the vehicle. Isn’t that right?
A. I was stopping the vehicle based on reasonable suspicion Chris Baxter was inside the vehicle.
¶ 15. Deputy Daffin never testified that he followed Williams in order to make an arrest. Rather, he consistently testified that he followed Williams in order to investigate whether Baxter was present in the vehicle. Deputy Daffin could not have initiated the pursuit for the sole purpose of arresting Baxter, as he was unsure whether Baxter was in the vehicle. Rather, Deputy Daffin intended to make an investigatory stop, which holds a “reasonable suspicion” standard. Eaddy, 63 So.3d at 1213 (¶ 14).
¶ 16. Reviewing the trial court’s factual findings per our standard of review, we find that the trial court’s findings were based on substantial evidence and were not clearly erroneous. And reviewing the Fourth Amendment issue de novo, we find Deputy Daffin had reasonable suspicion to conduct a traffic stop based on his prior knowledge of Baxter and Williams. “For an officer to have legal authority for an investigative stop, he need not have probable cause to make an arrest. He need only have a reasonable suspicion that the accused is involved in a felony.” Jack v. State, 878 So.2d 1078, 1081 (Miss. Ct.App.2004) (citing Haddox v. State, 636 So.2d 1229, 1233 (Miss.1994)). Deputy Daffin was aware that Baxter had an outstanding warrant for his arrest, and he knew that Baxter and Williams were often together. When he saw the arm of a passenger in the truck, he suspected it was Baxter and attempted to investigate further.
¶ 17. We find Deputy Daffin acted reasonably in attempting to determine whether Baxter was in the vehicle. Thus, Deputy Daffin’s initial attempt to conduct an investigatory stop did not violate the Fourth Amendment. Further, once “a suspect flees from the police when he has been detained on reasonable suspicion, the officers acquire probable cause to effectuate an arrest.” Dies, 926 So.2d at 920 (¶ 31) (citing Mitchell v. State, 792 So.2d 192, 204 (¶ 46) (Miss.2001)). Because Deputy Daffin had reasonable suspicion to conduct an investigatory stop, he also obtained probable cause for an arrest once Williams fled. Thus, the evidence obtained as a result of Deputy Daffin’s pursuit was admissible, as it was not fruit of the poisonous tree. This issue is without merit.

II. Self-incrimination

¶ 18. Baxter asserts that he was unable to voluntarily and intelligently waive his Miranda rights due to his low IQ, drug addiction, lack of sleep, physical discomfort, and physical abuse by law enforcement. Thus, he argues his confession should have been suppressed.
¶ 19. “[P]rior to custodial interrogation, the accused must be advised of his right to remain silent and his right to counsel.” Chim v. State, 972 So.2d 601, 603 (¶ 7) (Miss.2008) (citing Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). These Fifth Amendment rights may be waived, but “the waiver must be voluntary, knowing, and intelligent.” Id. A waiver is voluntary when “it is the result of a free and deliberate choice rather than intimidation, coercion!,] or deception.” Id. at 603 (¶ 8) (internal quotation marks and citation omitted). “A waiver is knowing and intelligent if it is made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.” Id.
*434 ¶ 20. “A criminal defendant who challenges the voluntariness of his waiver of rights has a due process right to a reliable judicial review of whether the confession was, in fact, voluntarily given.” Jennings v. State, 127 So.3d 185, 190 (¶ 8) (Miss.2013). The trial judge, sitting as the finder of fact, “should ascertain, under the totality of the circumstances and beyond a reasonable doubt, that the defendant’s statement was freely and voluntarily given, and was not the result of force, threat, or intimidation.” Chim, 972 So.2d at 603 (¶ 9). Factors for the trial court to consider are “the defendant’s experience and familiarity with the criminal justice system, intellectual capacity, educational background, degree of literacy, emotional state[,] and any mental disease or other defect.” Brown v. State, 839 So.2d 597, 600 (¶ 10) (Miss.Ct.App.2003) (citing Holland v. State, 587 So.2d 848, 860 (Miss. 1991)). “Once the trial judge has determined, at a preliminary hearing, that a confession is admissible, the defendant/appellant has a heavy burden in attempting to reverse that decision on appeal.” Frost v. State, 483 So.2d 1345, 1350 (Miss.1986). We review the trial judge’s admission of a confession for manifest error. Chim, 972 So.2d at 607. “[W]here the evidence is contradictory, [the appellate court] ‘generally must affirm.’ ” Id. (quoting Hunt v. State, 687 So.2d 1154, 1160 (Miss.1996)).

A. Intellectual Disability and Illiteracy

¶ 21. A joint hearing was held on Baxter’s motions to suppress his confession and preclude consideration of the death penalty. Two expert psychologists testified: Dr. W. Criss Lott for the State, and Dr. Gerald O’Brien for the defense. Both concluded that Baxter was intellectually disabled[4] for purposes of receiving the death penalty.[5] However, “there is no per se rule that mental retardation renders a confession involuntary and inadmissible.” McGowan v. State, 706 So.2d 231, 235 (Miss.1997). Instead, “the mental abilities of an accused are a factor — but only one factor — to be considered.” Neal v. State, 451 So.2d 743, 756 (Miss.1984). In determining “whether the confession was intelligently and voluntarily made,” the trial court must consider “all of the facts and circumstances of the particular confession and the interrogation leading up to it....” Id.
¶ 22. Dr. O’Brien interviewed Baxter and administered a series of tests, including the Wechsler Adult Intelligence Scale, Fourth Edition — a standard IQ test. Baxter scored poorly on all the tests. On the IQ test, Baxter scored a 66. Given a 95% confidence rating, Baxter’s IQ range was between 63 and 71. Dr. Lott administered a different series of tests in order to avoid the “practice effect” — that is, artificially inflated scores that may occur from taking the same test twice. To determine Baxter’s IQ, Dr. Lott gave Baxter the Stanford-Binet Test, Fifth Edition. Baxter scored a 79, giving him an IQ range of 75 to 83. Baxter’s other test scores were low, consistent with the scores found by *435 Dr. O’Brien. Both experts found that Baxter was cooperative. Neither found malingering.
¶ 23. Both experts reviewed the video of Baxter’s statement to police multiple times. From interviewing Baxter, and from watching the confession video, Dr. O’Brien opined that Baxter “probably” could not understand his Miranda rights. Dr. O’Brien acknowledged that Baxter may have “some carryover knowledge” from his prior experiences with law enforcement, but he still found that it was “not likely” that Baxter “clearly” understood his rights. Dr. O’Brien, however, testified that Baxter was competent to stand trial, as long as his attorney took “special care” to explain the proceedings. Dr. Lott testified that from his interview with Baxter, and from watching the confession video, Baxter understood his Miranda rights, and was able to knowingly, intelligently, and voluntarily waive those rights. Dr. Lott noted that at the beginning of Baxter’s interview with law enforcement, Baxter stated: “I can’t read or nothing.” And he stated that although he had completed eleven and one-half years of school, “[a]ll they was doing was pushing [him] through the grades.” Dr. Lott believed that law enforcement were careful to explain Baxter’s rights to him after he informed them that he could not read. Further, while Dr. Lott found Baxter intellectually disabled for purposes of the death penalty, he stated that in another situation, such as placement in a facility for the developmentally disabled, Baxter would not likely qualify.
¶ 24. Baxter’s argument that'his confession was inadmissible relies in part on statements made in a motion in limine filed by the State in Williams’s trial. The motion is dated August 9, 2012 — three months after the conclusion of Baxter’s trial — and, therefore, was not before the trial court in Baxter’s case. The motion sought to exclude Baxter’s recorded interview and statements to law enforcement. Baxter quotes a sentence from the motion in which the State argued that Baxter’s statement was “finreliable, untrustworthy, [and] not supported by corroborating evidence .... ” However, the State did not make this argument based on Baxter’s intellectual capacity; rather, it sought to exclude the statements as uncorroborated, inadmissible hearsay, for which no exception applied. The motion goes on to state:
Mr. Baxter’s statement is unreliable and lacks any measure of trustworthiness because his story evolved throughout the interview[,] and when faced with evidence that witnesses saw [Williams] driving, Mr. Baxter modified his statement from claiming to be the driver of the vehicle, to claiming that he was directing Ms. Williams to drive, to admitting Ms. Williams was driving in the beginning of the pursuit.
[[Image here]]
[W]e must remain mindful that his statements concerning Ms-. Williams’[s] involvement are not exculpatory as to Ms. Williams, are not supported by corroborating evidence as to Ms. Williams’[s] involvement in the Sheriffs murder, he and Ms. Williams were in a dating relationship at the time Mr. Baxter made the statement, Mr. Baxter has motive to lie on behalf of Ms. Williams in light of not only their romantic relationship but also the fact that he knew he was going to jail as a result of his guilty plea in the weeks prior to the murder.
¶ 25. The fact that Baxter’s statement was contradictory at times does not render the statement inadmissible. See Rogers v. Richmond, 365 U.S. 534, 543-44, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961) (“[A] legal standard which [takes] into account the circumstance of probable truth or falsi *436 ty ... is not a permissible standard under the Due Process Clause of the Fourteenth Amendment.”)- Rather, the trial court must consider whether the defendant’s confession was intelligently and voluntarily given — “a question to be answered with complete disregard of whether or not petitioner in fact spoke the truth.” Id. at 544.
¶26. The trial court considered Dr. O’Brien’s and Dr. Lott’s assessments of Baxter, as well as Baxter’s IQ. The trial court also considered that Baxter was familiar with the criminal-justice system, as Baxter had at least four felony convictions and multiple other encounters with law enforcement. For each of his prior convictions, Baxter was found to have knowingly and voluntarily waived his Miranda rights. In his statement to police, Baxter identified multiple sheriffs deputies by name, stated that he was able to recognize each one’s face, and knew which patrol vehicle each drove. Further, the trial court found no evidence that Baxter was “threatened, coerced, or offered rewards to induce the confession.” And the trial court found no evidence that Baxter was under the influence of drugs or alcohol. We find the trial court correctly considered the totality of the circumstances in finding Baxter’s confession admissible. This issue is without merit.

B. Physical Discomfort, Physical Abuse by Law Enforcement, and Drug Use

¶ 27. Baxter was taken into custody at approximately 6:30 a.m. Baxter’s interview began at 9:35 a.m. He was cut and bruised. He was wearing only shorts, no shirt or shoes. He stated he had not “had much sleep in a couple of days.” Near the beginning of the interview, he told officers that he was cold, and he was given- a shirt. Baxter admitted that he had “got strung out on some dope” (methamphetamine), after he failed to appear for court a few days earlier. Baxter was not asked when this drug use occurred or how much he ingested. He asserts he was not given anything to eat or drink. Finally, he argues that, near the end of the interview, officers misled him into thinking the interview was over and the recording had stopped, when it had not. Baxter argues these factors rendered his confession involuntary.
¶ 28. The officers testified that Baxter appeared in the interrogation room dressed as they had found him in the trailer. An officer admitted that a struggle ensued during Baxter’s arrest, during which Baxter was forced down on the carpet in the bedroom and tased. The officer stated that an abrasion on Baxter’s face may have occurred during the struggle, and the mark was “consistent with maybe a carpet burn.” Baxter admitted that he received many cuts and bruises on his face and body while running through the woods, fleeing from law enforcement. During the interview, he was asked if he was high. He responded, “I need some more.” The officer then stated, “You need some more so that means you’re not [high] right now. Ok so that mean[s] ... you understand what you’re saying right? Chris?” Baxter responded, “Yeah.” At no point during the interview did Baxter ask for food or water.
¶ 29. In his findings, the trial judge noted that Baxter admitted during his statement that he was not under the influence of alcohol or drugs. Also, the trial judge watched the interrogation video and did not find that Baxter appeared to be intoxicated. There is no evidence that Baxter’s methamphetamine use several days prior rendered him incapable of knowingly and voluntarily waiving his Miranda rights. Baxter was able to understand and respond to officers’ questions, and he remembered many details from the high-speed chase. Likewise, the trial *437 judge found no evidence that law enforcement threatened or coerced Baxter into making a statement. It appeared from the video that officers attempted to make Baxter as comfortable as possible. And while a physical altercation occurred prior to his interview, the altercation was a result of Baxter’s refusal to allow the officers to handcuff him.
¶ 30. Regarding law enforcement’s failure to turn off the recording device, we cannot find this rendered Baxter’s confession inadmissible. After Investigator Joel Wallace stated the interview had concluded, the following exchange occurred:
WALLACE: How much time have you done all together?
BAXTER: About two years.
[[Image here]]
WALLACE: Two years — I mean that’s the most you ever done? Why you never got caught, I mean, huh?
Baxter: Huh?
WALLACE: The tape’s off. Ok. My tape recorder’s off. I mean, you ... cooking up dope. Why you ain’t never got caught. How you never got caught, man[?]
BAXTER: I did.
WALLACE: But I mean, I’m talking about, s* * *, you still cooking it, you know. I mean that’s the word on the street.
BAXTER: That, that’s been the word on the street.
WALLACE: Is it true?
NICHOLSON: Uh.
BAXTER: Huh?
NICHOLSON:[6] I gotta ask you one more question. Can we turn the recorder back on?
WALLACE: Uhhuh.
BAXTER: I belive [sic] I got a meth problem, really.
WALLACE: Ok. Do you?
BAXTER: Uhhuh.
WALLACE: Hold on one minute. Let me turn this on.
¶ 31. Once Investigator Wallace thought he had turned the recorder back on, he asked Baxter if he still understood his rights and was willing to talk to law enforcement on his own free will. Baxter responded in the affirmative. He was then questioned about “a tin can” that was thrown out the car window during the chase. Baxter stated he did not throw it out the window, but it was possible that Williams did. The interview concluded. There is no evidence that the officers were attempting to trick Baxter. Further, while Baxter mentioned that he had been previously incarcerated, at trial he withdrew his motion to suppress prior convictions and crimes, including those mentioned in the confession. Also, Baxter’s statement that he had “a meth problem” was not new information, as he had mentioned earlier in his interview that he had recently used methamphetamine. In fact, he stated that he needed “some more” right then.
¶ 32. As stated, the admission of a confession into evidence is reviewed for manifest error. Chim, 972 So.2d at 607 (¶ 20). The trial court reviewed the totality of the circumstances and found the confession admissible. We find no manifest error in its decision to admit the confession. .

III. Williams’s Grand Jury Testimony

¶ 33. Baxter argues his indictment should have been dismissed, as Williams falsely testified before the grand jury. Williams told the grand jury that *438 while she was initially driving on the day of the pursuit, she and Baxter switched seats before the sheriff was struck and killed. Baxter argues this version of event is unbelievable and contradicted by the eyewitness testimony. Further, Baxter asserts that the State is presenting contra- ■ dictory positions, as the State’s theory of the case at Williams’s trial was that Williams was driving the truck when it struck Sheriff Welford. Baxter asserts that the State ■ was made aware of Williams’s perjured grand jury testimony two weeks prior to Baxter’s trial, when Williams decided she would not testify. Baxter argues that at this point, the State was under a duty to inform him and the trial court of the alleged false testimony.
¶ 34. Baxter cites to United States v. Basurto, 497 F.2d 781, 785-86 (9th Cir.1974), which states
that the Due Process Clause of the Fifth Amendment is violated when a defendant has to stand trial on an indictment which the government knows is based partially on perjured testimony, when the perjured testimony is material, and when jeopardy has not attached. Whenever the prosecutor learns of any perjury committed before the grand jury, he is under a duty to immediately inform the court and opposing counsel — and, if the perjury may be material, also the grand jury — in order that appropriate action may be taken.
However, as noted by the Fifth Circuit, “[a] subsequent Ninth Circuit opinion, [United States ] v. Bracy, 566 F.2d 649, 655 (9th Cir.1977), ... has not only cut back on the reach of Basurto but has also questioned its continuing validity.” United States v. Cathey, 591 F.2d 268, 271-72 (5th Cir.1979). In Bracy, the Ninth Circuit held “that what the court [in Basurto ] said on the duty of a prosecutor to immediately inform [the] court and counsel of the perjury, irrespective of materiality, is dictum.” Bracy, 566 F.2d at 655. The Fifth Circuit “has never decided whether to adopt the constitutional rule laid down in Basurto or the modified rule of Bracy.” Cathey, 591 F.2d at 271-72 (footnote omitted).
¶ 35. Regardless of the implications of Basurto, no clear evidence exists that Williams lied to the grand jury. “A prerequisite to the applicability of the Basurto rule is a finding that the government witness perjured himself.” Id. at 272. There was no such finding here. The testimony throughout both Williams’s and Baxter’s trials was conflicting. All but one of the witnesses saw a female driving before the incident, but Baxter confessed he was the driver at the moment the sheriff was struck. Williams told the grand jury that she was initially driving, but switched places with Baxter before the sheriff was hit. This is consistent with Baxter’s confession. “Absent a finding that perjury was committed, there is no basis for dismissing the indictment.” Id. This issue is without merit.

IV. Juror Misconduct

¶ 36. Prior to trial, Juror 24 informed the trial court that he had heard Juror 23 and “a lady up front” discussing the case in the hallway. When asked what was discussed, Juror 24 stated: “About what this the [sic] case is about.... About the sheriff being killed.” Juror 23 had previously admitted to the court that he had read about the case on the internet, but stated he could remain impartial. Juror 24 then stated that nothing he heard could have caused him to form an opinion on the case. Baxter’s counsel made a motion to strike the entire jury panel. The motion was denied. His counsel then moved to strike Jurors 23 and 24 for cause. The motion was taken under ad *439 visement, and the trial court cautioned the potential jurors again not to discuss the case. Baxter used peremptory strikes on Jurors 23 and 24. Baxter argues his right tó a fair trial was jeopardized because the trial court failed to individually interview other members of the panel to find out who else had discussed the case or heard the discussion in the hallway.
¶ 37. “The trial judge has a duty to ensure ‘that a competent, fair and impartial jury is empaneled.’ ” Neal v. State, 15 So.3d 388, 398 (¶ 20) (Miss.2009) (quoting Tighe v. Crosthwait, 665 So.2d 1337, 1339 (Miss.1995)). A rebuttable presumption exists that “the voir dire process used at trial was ‘sufficient to ensure a fair and impartial jury.’ ” Id. at 398-99 (¶ 20) (quoting Ross v. State, 954 So.2d 968, 988 (¶ 31) (Miss.2007)). A trial court’s finding that a jury is impartial is reviewed for abuse of discretion. Id. at 399 (¶ 20). A trial court’s refusal to quash a venire is also reviewed for abuse of discretion. Beasley v. State, 74 So.3d 357, 363 (¶ 28) (Miss.Ct.App.2010) (citation omitted). Prejudice must be shown in order to reverse a trial court’s decision not to quash a jury panel. Id.
¶ 38. Baxter argues that the panel members should have been individually questioned regarding the hallway conversation due to the “highly prejudicial” media coverage surrounding the case. Baxter states articles reported that the case was initially a death-penalty case, but that Baxter had been deemed ineligible for the death penalty because of his intellectual disability. Specifically, though, Baxter cites to public comments under the articles that showed a negative reaction to Baxter’s ineligibility for the death penalty. These articles and comments are not part of the record on appeal and, thus, will not be considered by this Court. Regardless, there is no evidence that the potential jurors read the articles or comments. The trial court was aware of the media coverage and attempted to gather an unbiased jury pool. The jury was called from Adams County and not George County, where the incident occurred. And despite Baxter’s claim that the trial court did not sufficiently attempt to investigate the influence of media coverage, the trial court questioned the jurors multiple times on the matter, including the following:
Do any of you know any of the purported facts of this case whether from ... news media or just town conversation or just what have you? ■ First, let me go back and ask you have any of you been exposed to any media coverage of this case whether it’s been radio, television, newspaper, e-mail, Facebook, or whatever all those things are now[?] Anybody that’s had any knowledge about anything about this case?
Multiple jurors raised their hands in response to this question. The trial court then twice asked follow-up questions regarding media coverage and those jurors’ abilities to be fair and impartial and to follow the instructions of the court. All but one juror said they could. That juror was stricken.
¶ 39. Jury-panel members “promise! ] to follow the law must be given considerable deference.” Beasley, 74 So.3d at 364 (¶ 32) (quoting Harrison v. State, 737 So.2d 385, 388 (¶7) (Miss.Ct.App.1998)). The trial court repeatedly questioned the panel members about their abilities to be fair and impartial despite seeing media coverage. The one juror who stated he could not be partial was stricken. Baxter has not shown how he was prejudiced by the trial court’s denial of his motion to quash the venire. Thus, we cannot find the trial court abused its discretion in denying the motion to strike the entire panel.

*440
V Relevance of Debbie Welford’s Testimony

¶ 40. Debbie Welford, Sheriff Welford’s wife, was called as the first witness by the State. Baxter did not object to her testifying, as long as her testimony was limited to identifying a picture of Sheriff Welford and stating he was employed as sheriff on the day he was killed. Any potential victim-impact testimony was objected to as a violation of Mississippi Rule of Evidence 401.[7] A proffer of her testimony was made, and the objection was overruled. Baxter argues the trial court erred in overruling his objection.
¶ 41. Debbie testified that she and Sheriff Welford were married for thirty-nine years, and that they had three children and seven grandchildren. She stated their children’s occupations, her occupation, and Sheriff Welford’s education and employment history. She identified a photograph of Sheriff Welford, and testified that he died on July 21, 2010. She was asked if she saw Sheriff Welford on July 21, 2010. She stated that she saw him that morning, and the last thing he said to her was, “turn my coffee pot on.”
¶42. “Victim impact statements are those which describe the victim’s personal characteristics, the emotional effect of the crimes on the victim’s family, and the family’s opinions of the crimes and the defendant.” Wells v. State, 698 So.2d 497, 512 (Miss.1997). We find Debbie’s testimony was not a victim-impact statement. No testimony was given regarding Sheriff Welford’s personal characteristics or the emotional effect of the crime on Sheriff Welford’s family. Nor was the family’s opinion of the crime or defendant discussed.
¶ 43. Debbie’s testimony is analogous to the victim’s husband’s testimony in Goff v. State, 14 So.3d 625, 652 (¶ 109) (Miss.2009). In Goff, the deceased victim’s husband stated the length of the couple’s marriage and the number of children they had, and he described the victim’s employment. Id. The victim’s character was not discussed, nor was the impact of her death on their family. Id. The supreme court found the testimony was not victim-impact testimony, as it only “concerned the background of the victim and merely set the stage for the presentation of relevant evidence.” Id. (internal quotation marks and citation omitted). The same is true here. We cannot find the trial court abused its discretion in admitting Debbie’s testimony.

VI. Evidence of Prior Convictions

¶ 44. Baxter filed motions in limine before trial to exclude evidence of any prior convictions and evidence related to his methamphetamine use for the three weeks prior to the crime. The motion regarding prior convictions was granted, with the exception of crimes related to the April 2010 guilty plea—manufacture and possession of methamphetamine—since his failure to appear for sentencing in that matter led to the pursuit by law enforcement on July 21, 2010. Prior crimes were mentioned in three places, which we will discuss separately.

A. April 2010 Guilty Plea

¶ 45.' Baxter argues that while evidence of his failure to appear for sentencing for the April 2010 plea was relevant, evidence of the crimes underlying his guilty plea was not.
¶ 46. Mississippi Rule of Evidence 404(b) states:
*441 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
However, “[e]videnee of other crimes or bad acts is ... admissible in order to tell the complete story so as not to confuse the jury.” Ballenger v. State, 667 So.2d 1242, 1257 (Miss.1995).
¶ 47. We find the evidence of Baxter’s crimes was necessary to tell the jury a complete story, and that their introduction was more probative than prejudicial under Mississippi Rule of Evidence 403. Further, Baxter cannot now complain of the crimes’ admission when he withdrew his objection to the introduction of portions of the confession that referenced the crimes. The trial court did not abuse its discretion in admitting the crimes underlying the guilty plea.

B. April 2010 Guilty-Plea Transcript

¶ 48. George County Circuit Clerk Chad Welford (unrelated to the victim) testified as to Baxter’s April 26, 2010 guilty plea to manufacture and possession of methamphetamine. He identified the transcript of Baxter’s guilty-plea hearing and the bench warrant for Baxter’s failure to appear for sentencing. The transcript referenced prior crimes committed by Baxter. The State reviewed the document and redacted any lines that referenced any crimes prior to the charges of manufacture and possession of methamphetamine, admitting that it was an oversight that the information was not initially redacted.
¶ 49. Baxter argues reversible error was committed because the transcript was “poorly redacted.” Baxter notes that the text surrounding the redacted portions implies felonies were committed, although the specific felonies are blacked out. When the objection arose at trial, the trial court instructed the prosecution and the defense to “get together and redact whatever the objection is to the other charges, and then I am going to let it be introduced.” Baxter’s attorney replied: “Your Honor, I’m not going to agree to redact anything.” The State then reviewed and blacked out portions of the transcript. Baxter’s counsel was given a chance to review the transcript and come to an agreement with the prosecution as to which statements to redact, but chose not to do so. We find that Baxter cannot now complain that insufficient information was redacted by the State. See Wells, 698 So.2d at 514 (failure to make objection waives claim on appeal). This argument is waived.

C. Unredacted Statement to Law Enforcement

¶ 50. Although Baxter withdrew his objection at trial to the suppression of • prior crimes mentioned in his statement to law enforcement, he now argues it was plain error for the trial court to admit them. It has routinely been held that an “[a]ppellant has no standing to seek redress from [an] alleged error of his own creation.” Caston v. State, 823 So.2d 473, 494 (¶ 68) (Miss.2002). This issue is waived.

VII. Statement Regarding “Appellate Review”

¶ 51. Baxter argues he is entitled to a new trial because the State mentioned “appellate review” at trial. This occurred during the direct examination of the George County Sheriffs Department dispatcher, who was reviewing the transcript of the dispatch log from the day of the incident.
*442 DEFENSE ATTORNEY: Judge, excuse me, if they’re going to do it this way, they’re going to have to use the whole document. You can’t just piecemeal it. This document says passenger Chris Baxter. It[] says occupied, not driven by him, and she needs to be honest about it. If that’s what the document says, the document speaks for itself. If she doesn’t — if we don’t want her to testify, just give the document to the jury and that’s okay, but she needs to tell the truth about what’s in the document.
THE PROSECUTOR: Your Honor, the document is in evidence. Counsel opposite has full cross. If he thinks she’s misleading something, ask a question, but I’m asking her the questions about parts of the document. The jury is. going to have the whole document. The State is not hiding anything.
THE COURT: Well, just indicate when you’re doing that what part of the document you’re talking about so there will be no confusion.
THE PROSECUTOR: Yes, Your Hon- or. We’re on page three, and Your Honor, the State — I will also submit to the Court that because ... the appellate court can’t see this, but the screen ... [is ] like a mile away.
(Emphasis added). Baxter’s counsel moved for a mistrial. When a curative jury instruction was suggested, Baxter’s counsel stated that he would refuse it. The motion for a mistrial was denied. And although no curative jury instruction was sought, the trial judge researched the matter on his own and decided no curative instruction was necessary.
¶ 52. Suggestions of appellate review are not allowed, as they could diminish the jury’s sense of responsibility. Booker v. State, 511 So.2d 1329, 1332 (Miss.1987). An exception is made for statements that are “invited or responsive to the statement of the defense counsel.” Id.
¶ 53. Baxter argues the statement made at trial was precisely the type of statement the Mississippi Supreme Court sought to prevent in Howell v. State, 411 So.2d 772 (Miss.1982). In Howell, the prosecutor told the jury in closing argument:
Let me say this to you, ladies and gentlemen, your decision, if you find [the defendant] guilty, will not be the final [decision]. There’s a Court above this that will look at this and see if you all made the right decision.... [The defendant] has the right to appeal and have another panel of Judges, solely, to look at this issue. If they find that it wasn’t done properly, they will send it back of they can turn him loose, up there.... You are not the final judges of this and if [the defendant] appeals [the verdict], he has the right to be out on bond.
Id. at 773.
¶ 54. We cannot find the statement made by the prosecutor in this case rose to the level of error committed in Howell. Here, the prosecutor’s statement was directed to the trial judge, and not made in an argument to the jury. It did not suggest that the jury should take their role less seriously because Baxter may appeal. Rather, the comment was made in response to Baxter’s counsel’s argument that the State was attempting to “piecemeal” the dispatch transcript. We find this issue is without merit.

VIII. Testimony of Megan Clark Jar-min

¶ 55. Jarmin was the only witness who testified to seeing a male driving *443 the maroon Z71 on the day of the incident. Baxter .argues her testimony was irrelevant, immaterial, highly prejudicial, and speculative, and should have been stricken.
¶ 56. Jarmin testified that she left work at 4 p.m. on July 21, 2010, to go to class at Pearl River Community College in Hat-tiesburg, Mississippi. She could not recall what time her class started, but she said she had to first go to the library to finish an assignment. According to Jarmin, at approximately 4:20 or 4:30, she saw a maroon truck driving toward her on Highway 98, coming from Bexley Road North. The truck was moving “extremely fast,” and failed to stop or slow down for a stop sign. She “hit [her] brakes” to avoid a collision. The truck drove off the road into a ditch and went down a side street. She testified the passenger’s side window was open, but she saw no passenger. She could see a male driver who “looked terrified. His eyes were real big.... [She] could see kind of craters right here a little bit in his face.” She saw the truck from its passenger side, and she did not notice if the front of the truck was damaged. She went to a friend’s house to pick up something; then she returned to a gas station next to the road where she had seen the truck turn. The road was blocked by a fire truck. As she waited, she saw a helicopter come and take Sheriff Welford away on a gurney.
¶ 57. It was undisputed from all other witnesses that the high-speed pursuit of the truck started at 2:35 p.m.; Sheriff Welford was struck at 2:53 p.m.; and the abandoned truck was found at 3:23 p.m. Baxter argues the timeline renders Jar-min’s testimony that she saw Baxter driving the truck after 4 p.m. impossible. Baxter argues the error was compounded when the State referenced her testimony three times in closing to support its argument. However, on redirect examination, Williams admitted that her memory was unclear as to the times. She was asked, “Do you know if you left work exactly at 4 o’clock?” She responded, “No, ma'am, I don’t. I’m just — it’s been two years. I don’t remember exactly what time I left.”
¶ 58. No objection was made to Jarmin’s testimony until the next day, at the close of the State’s evidence, after multiple other witnesses had testified. “A contemporaneous objection is necessary to preserve an error for appellate review.” Hughes v. State, 90 So.3d 613, 631 (¶53) (Miss.2012). We find Baxter’s motion to strike Jarmin’s testimony, after multiple other witnesses had testified, was not a contemporaneous objection sufficient to preserve the issue for appellate, review. Thus, this issue is proeedurally barred. Notwithstanding the bar, we find the trial court acted within its discretion in allowing Jarmin’s testimony. “The standard of review for the admission or suppression of evidence is abuse of discretion.” Id. Jar-min admitted on redirect examination that her memory may not have been clear. “[W]eighing the credibility of witnesses is the exclusive province of the jury.” Renfro v. State, 118 So.3d 560, 564 (¶ 14) (Miss. 2013). We cannot find the trial court abused its discretion in denying Baxter’s motion to strike Jarmin’s testimony.

IX. Jury Instructions S-5 and S-7

¶ 59. Baxter argues the trial court erred in giving jury instructions S-5 and S-7. These instructions gave the jury the alternative of finding Baxter guilty as a an accessory before the fact or as an aider and abettor if Baxter was not deemed the principal offender. He argues these instructions were not supported by the evidence and allowed the jury to render a guilty verdict without finding that Baxter possessed the proper mens rea for capital murder.
*444 ¶ 60. “When determining whether the trial court erred in giving or refusing various instructions, we consider as a whole all the instructions given.” Dilworth v. State, 909 So.2d 731, 734 (¶ 10) (Miss.2005). The trial court’s decision to give or refuse certain jury instructions is reviewed for abuse of discretion. Flowers v. State, 51 So.3d 911, 912 (¶ 5) (Miss. 2010). “[I]f the instructions fairly announce the law of the case and create no injustice, no reversible error will be found.” Rubenstein v. State, 941 So.2d 735, 785 (¶ 224) (Miss.2006).

A. Jury Instruction S-5

¶ 61. Baxter argues that jury instruction S-5 was without foundation in the evidence. Jury instruction S-5 states: “One who willfully, unlawfully, and felo-niously aids, abets, assists, or otherwise encourages the commission of a crime is just as guilty under the law as if he or she had committed the whole crime with his or her own hands.”
¶ 62. At trial, Baxter’s counsel objected to jury instructions S-5, but not on the basis argued on appeal. Rather, the objection was made based on the instruction being cumulative to jury instruction S-6. Jury instruction S-6 was withdrawn, as the State agreed it was “confusing and cumulative.” Instruction S-6 was replaced with a redrafted version, S-6A. “[A]n appellant is not entitled to raise new issues on appeal that he has not first presented to the trial court for determination.” Bush v. State, 895 So.2d 836, 842 (¶ 13) (Miss.2005). Baxter’s argument that the instruction was not supported by the evidence is waived for the failure to make this specific objection at trial.
¶ 63. Notwithstanding the procedural bar, we find Baxter’s argument without merit. The evidence supported an aiding and abetting instruction. Mississippi Code Annotated section 97-1-3 (Rev.2006) states: “Every person who shall be an accessory to any felony, before the fact, shall be deemed and considered a principal, and shall be indicted and punished as such; and this whether the principal have been previously convicted or not.” An “aider and abettor” is one “who is present during the commission of a crime and aids, counsels, or encourages another in the execution of that offense.... ” Walton v. State, 752 So.2d 452, 457 (¶ 16) (Miss.Ct. App.1999) (citing Hoops v. State, 681 So.2d 521, 533 (Miss.1996)). An aider and abettor “is as guilty as the principal offender.” Id.
¶ 64. While Baxter confessed that he was the driver when the sheriff was struck and killed, other witnesses testified they saw a female driving. Also, Howell testified that she spoke with Williams during the chase, and Williams said, “They’re everywhere. They’re everywhere. They’re all over me. I’ve got to change roads.” Howell then heard Baxter in the background say, “Just go then. Just go.” This evidence supported jury instruction S-5. This issue is procedurally barred; alternatively, it is without merit.
B. Jury Instruction S-7
¶ 65. Instruction S-7 states:
The Court instructs the Jury that it is not necessary that an unlawful act of the Defendant be the sole cause of death. Responsibility attaches if the act of the Defendant contributed to the death. If you believe the Defendant committed an unlawful act or aided and abetted another in committing an unlawful act that contributed to the death of Gary Wel-ford, then the Defendant is not relieved of responsibility by the fact that other *445 causes may have also contributed to his death.
(Emphasis added).
¶ 66. Baxter argues instruction S-7 was not consistent with Mississippi law, because it allowed the jury to find him guilty of capital murder if he committed any “act” or “illegal act” that contributed to the sheriffs death. Baxter argues the jury could have interpreted this to include his failure to appear at the July 19, 2010 sentencing hearing.
¶ 67. Again, Baxter objected to this instruction at trial, but not on the basis argued on appeal. At trial, Baxter’s counsel objected to jury instruction S-7 on the basis that the instruction was cumulative to instruction S-6A. Thus, this issue is waived. See Bush, 895 So.2d at 842 (¶ 13). Notwithstanding the procedural bar, we find that any confusion allegedly created by instruction S-7 was clarified through other instructions.
¶ 68. Instruction S-6A stated that Baxter was liable for the acts of an agent “acting under [his] direction.... ” Further, jury instruction S-3A required that Baxter have acted “alone or in conjunction with another” in causing the sheriffs death. Baxter asserts that these instruction did not cure the error, but rather served to further confuse the jury. Baxter argues the confusion was demonstrated by the jury’s note sent to the judge during deliberations: “In Item 2 of the capital murder directive, is ‘in conjunction with’ all that is required? Explanation: we are having some conflict between ‘in conjunction with’ and if the Defendant was ‘directing.’ ” The trial court responded that the jury had received all of the evidence ... as well as the instructions of the Court, and instructed the jury to continue deliberations.
¶ 69. Regardless of whether the jury found Baxter acted “in conjunction with” Williams or was “directing” Williams, either would support a finding of capital murder. A person who is present at the commission of a criminal offense and aids, counsels, or encourages another in the commission of that offense, is equally guilty as the principal offender. Miss. Code Ann. § 97-1-3. This issue was waived for failure to raise the specific objection argued on appeal. Notwithstanding, we find that the jury instructions, read as a whole, properly instructed the jury on the elements of capital murder and accomplice liability. This issue is without merit.

X. Sufficiency of the Evidence

¶ 70. Baxter argues the evidence did not support a capital-murder conviction for three reasons: (1) his confession was untrustworthy; (2) Baxter did not know the vehicle had struck Sheriff Welford; and (3) Baxter did not aid or abet in the murder.
¶ 71. To be sufficient to sustain a guilty verdict, the evidence must show “beyond a reasonable doubt that [the] accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.” Bush, 895 So.2d at 843 (¶ 16). The evidence must be viewed in the light most favorable to the State. Id. We must reverse and render if the facts and inferences “point in favor of the defendant on any element of the offense with sufficient force that reasonable [jurors] could not have found beyond a reasonable doubt that the defendant was guilty....” Id.
¶ 72. Murder is “[t]he killing of a human being without the authority of law ... [w]hen done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human *446 life...Miss.Code Ann. § 97-3-19(1)(b) (Supp.2013). Capital murder occurs when a murder is “perpetrated by killing a peace officer ... while such officer ... is acting in his official capacity or by reason of an act performed in his official capacity, and with knowledge that the victim was a peace officer....” Miss.Code Ann. § 97-3-19(2)(a) (Supp.2013).
¶ 73. “[A]n accessory to any felony, before the fact, shall be deemed and considered a principal, and shall be indicted and punished as such.... ” Miss.Code. Ann. § 97-1-3. To prove Baxter liable as an accessory, the State was required to show that Baxter aided, counseled, or encouraged Williams in the commission of the offense. This includes “acts, words, signs, motions, or any conduct which unmistakably evinces a design to encourage, incite or approve of the crime, or even by being present, with the intention of giving assistance, if necessary, though such assistance may not be called into requisition.” Lynch v. State, 877 So.2d 1254, 1279 (¶ 79) (Miss.2004).
¶ 74. Baxter confessed that he was the driver when the vehicle struck Sheriff Welford. Baxter admitted that he saw uniformed deputies standing at the intersection of Bexley and Howard Roads, and he saw patrol cars. Baxter admitted that he “might of nudged” one of the deputies as Baxter drove through the road block. Baxter knew law enforcement would be searching for him due to his involvement in the incident, and he and Williams hid in a trailer in the woods. Howell testified that she spoke with Williams during the chase. During this phone call, Howell heard- Williams say, “They’re everywhere. They’re everywhere. They’re all over me. I’ve got to change roads.” Howell then heard Baxter in the background say, “Just go then. Just go.” All but one witness identified a female driver. Deputy Duane Bowlin testified that at the moment of impact, he “thought [he] saw a face of a passenger,” and although he “couldn’t be certain,” he believed the passenger “had hair characteristics similar to Chris Baxter.”
¶ 75. While the jury was presented with conflicting evidence as to who was driving the truck at the moment Sheriff Welford was hit, the jury was allowed to find Baxter guilty of capital murder whether he was the driver or whether Williams was the driver and Baxter aided and abetted during the chase. In his confession, Baxter was adamant that Williams did nothing wrong, and that her attempt to evade law enforcement was solely at his direction. Baxter argues the confession was irrelevant because it was untrustworthy. However, this was for the jury to decide. See Renfro, 118 So.3d at 564 (¶ 14).
¶ 76. Viewing the evidence in the light most favorable to the State, we find the State presented sufficient evidence such that the jury could find Baxter guilty beyond a reasonable doubt. Thus, the trial court did not err in denying Baxter’s motion for a judgment notwithstanding the verdict or new trial. This issue is without merit.

XI. Weight of the Evidence

¶ 77. Baxter argues the verdict was against the overwhelming weight of the evidence because: (1) the jury had no evidence that Baxter was driving the truck ■ at the time Sheriff Welford was killed; (2) the evidence did not show that Baxter knew that the person he “nudged” was a peace officer; (3) the evidence did not prove that Baxter was an accessory before the fact.
¶ 78. “[W]e will only disturb a verdict when it is so contrary to the over *447 whelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.” Bush, 895 So.2d at 844 (¶ 18). The evidence must be viewed in the light most favorable to the verdict. Id.
¶ 79. As stated, Baxter confessed to the crime. And even if the jury did not find his confession credible, it was within the jury’s discretion to find that Baxter aided and abetted in the crime. We find no merit to Baxter’s argument that he did not know that he struck a peace officer. He confessed that he saw uniformed deputies at the intersection, and stated he realized that he “nudged” one of them. The deputies present also testified that they were in full view and uniformed, and blue lights were flashing in their vehicles. Baxter admitted that Williams was under his direction during the portion of the chase when she was driving. And Howell testified that she heard Baxter instruct Williams, “Just go then. Just go.”
¶ 80. Viewing the evidence in the light most favorable to the verdict, we find the verdict was supported by the overwhelming weight of the evidence. This issue is without merit.

XII. Parole Ineligibility

¶ 81. The trial court found life without parole was the only sentencing option available to Baxter, since the death penalty was precluded. Baxter argues the trial court failed to consider a third sentencing option: “[¡Imprisonment for life in the State Penitentiary with eligibility for parole as provided in [Mississippi Code Annotated sjection 47-7-3(1)(f) [ (Rev. 2011) ].” Miss.Code Ann. § 97-3-21(3)(e) (Supp.2013).
¶ 82. Section 47-7-3(l)(f) states: “No person shall be eligible for parole who is charged, tried, convicted and sentenced to life imprisonment under the provisions of [Mississippi Code Annotated sjection 99-19-101 [ (Rev.2006) ].” As relevant to this ease, section 99-19-101(1) states that once a defendant is convicted of capital murder, “the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death, life imprisonment without eligibility for parole, or life imprisonment.” Our supreme court has held that “[tjhe reading of these statutes together indicate[s] that a defendant on trial for capital murder may only be sentenced to death or life imprisonment without eligibility of parole.” Flowers v. State, 842 So.2d 531, 557 (¶ 77) (Miss.2003). Since our supreme court has held there is no parole eligibility for capital murder, this issue is without merit. The trial court correctly sentenced Baxter to life without parole.
¶83. Baxter argues that, alternatively, if he is ineligible for parole, his sentence is unconstitutional, as it is disproportionate to the crime. See Solem v. Helm, 463 U.S. 277, 306, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983) (“[T]he Eighth Amendment prohibits imposition of a sentence that is grossly disproportionate to the severity of a crime.”). For comparison, Baxter cites to other murder statutes for which the maximum sentence is forty years. See Miss.Code Ann. § 97-9-72(4) (Rev.2006) (failure to yield to a valid traffic stop that results in death of another); Miss.Code Ann. § 97-3-19 (Supp.2013) (depraved-heart murder). However, Baxter’s conviction is distinguishable, as he was found guilty of capital murder. Baxter further argues life imprisonment without parole is disproportionate considering his intellectual disability. However, under our law, Baxter’s intellectual disability only precluded the death penalty, not life imprisonment without parole.
*448 ¶ 84. We find Baxter’s arguments on appeal are without merit.
¶ 85. THE JUDGMENT OF THE CIRCUIT COURT OF GEORGE COUNTY OF CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT ELIGIBILITY FOR PAROLE, WITH THE SENTENCE TO RUN CONSECUTIVELY TO THE SENTENCES IN CAUSE NUMBERS 2009-10,073 AND 2010-10,057 IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO GEORGE COUNTY.
LEE, C.J., GRIFFIS, P.J., BARNES, ROBERTS, CARLTON, MAXWELL AND FAIR, JJ., CONCUR. JAMES, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION. ISHEE, J., NOT PARTICIPATING.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. The transcript and various exhibits from Williams's trial were included in Baxter's appellate record per a joint motion by Baxter and the State to supplement the record.

. Williams’s appeal is also before this Court.

. Dr. O’Brien stated that “mental retardation” and “intellectual disability” were interchangeable terms, with "intellectual disability” being "the currently accepted official language.”

. Dr. Lott found that Baxter was intellectually disabled for purposes of the death penalty under the standard adopted in Chase v. State, 873 So.2d 1013, 1028 (¶70) (Miss.2004) (holding “that mental retardation may, under certain conditions, be present in an individual with an IQ of up to 75”). However, he stated that in another situation, such as placement in a facility for the developmentally disabled, Baxter would not likely qualify.

. Special Agent Joseph Nicholson.

. “ 'Relevant Evidence1' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” M.R.E. 401.